IN THE UNITED STATES DISTRCT COURT
NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| ARGO Wealth Management, INC. | : | CASE NO: |
| 121 South Main Street, Suite 105 | : | |
| Akron OH 44308 | : | JUDGE JOHN ADAMS |
| | : | |
| AURORA HILL LTD | : | COMPLAINT FOR MONETARY |
| 121 South Main Street | : | DAMAGES IN EXCESS OF $75,000.00 |
| Suite 105 | : | |
| Akron Ohio 44308 | : | |
| | : | |
| DAN MILLER | : | |
| 121 South Main Street | : | |
| Suite 105 | : | |
| Akron OHIO 44308 | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| -vs- | : | |
| | : | |
| JOHN BREMNER | : | |
| 514 Countryside Drive | : | |
| Wheaton, IL 60187 | : | |
| | : | |
| WILLIAM REAVIS | : | |
| 1057 Marcus Court | : | |
| Lake Zurich, IL 60047 | : | |
| | : | |
| THOMAS BURKE | : | |
| 104 N. Garfield Avenue | : | |
| Hinsdale, IL 60521. | : | |

Defendants

Now come Plaintiffs, Argo Futures Group Inc., Aurora Hill LTD. And Dan Miller, by
and through counsel, and do hereby state the following as their causes of action in the above
captioned matter:

1. Plaintiff Argo Wealth Management, Inc. is an Ohio corporation whose principal place of

   business is located in Summit County, Ohio.

2.  Aurora Hill Ltd is an Ohio limited partnership whose principal place of business is located in Summit County, Ohio.

3.  Argo Wealth manages, as a general partner, Aurora Hill.

4.  Dan Miller is an individual whose residence is located in Ohio and is the principal and manager of Argo Wealth.

5.  All three plaintiffs are residents of the state of Ohio and do not have residences or physical places of business in any state other than Ohio.

6.  Defendant William Reavis is a resident of the state of Illinois, and during all times pertinent to this complaint was an associated person of Postrock Brokerage, LLC and was an investment manager for John Bremner.

7.  Defendant John Bremner is an individual who is a resident of the State of Illinois and was an investor in Aurora Hill.

8.  That complete diversity of citizenship exists between all plaintiffs and all defendants.

9.  Aurora Hill operated subject to a partnership agreement that required that all disputes related to the partnership be brought in either Ohio State Court in Portage County or in the Northern District of Ohio.

10. That Defendant Reavis worked for a company named PostRock that was affiliated with Aurora Hill.

11. That on information and belief Defendat Reavis learned of the early success of Aurora Hill through his employment at Post Rock.

9.12.     That until January of 2019, Defendant Reavis had no relationship with Aurora Hill, Miller or Argo.

10.13.　　That on or about January of 2019 Defendant Reavis approached Defendant Bremner about investing in Aurora Hill.

14. That after initial conversations with Bremner, Reavis reaches out to Miller to discuss the possibility of Bremnder becoming a partner in Aurora Hill.

15. Tha during this conversation, ,Miller discloses to Reavis that internal trading is the income generator for Aurora Hill, and that trading is being done at high volume.

16. That Miller explicitly states to Reavis that before Bremner would be allowed to become a partner that he will need a full understanding of the program, including its trading model, volume of trading and risks of investing.

17. That Reavis still insists that Bremner is an appropriate investor for the Aurora Hill program.

11.18.　　That based on the recommendation of Reavis, Bremner approached Aurora Hill regarding investment in same

12.19.　　That at the time Bremner approached Aurora Hill, through Miller, Aurora Hill was not soliciting new investors.

13.20.　　That Bremner, through Reavis, was provided all Aurora Hill documentation.

21. That Bremner personally spoke with one of Aurora Hill's Money Managers (CTA's) and the General Partner before investing with Aurora Hill.

22. That Miller would not let Bremner invest until he did an interview with one of Aurora Hill's money manager's, Joel.

23. That prior to the interview with Joel,  Miller tells Bremner that the Auroa Hil program does not have a long track record, utilizes a high volume of "turns" and that the market is volatile.

24. That Bremner insisted the program was what he was looking for and does not need to interview the trader before investing.

25. That Miller insists on the interview with Joel, over Bremner's objections.

26. That Bremner sends an email to Miller complaining about the requirements to invest and insisting he wants to join as soon as possible.

27. That in response to this email, Miller sends an email to Reavis stating that he is reluctant to take on Bremner as a partner, due in large part to his attitude and Miller's belief that he will be high maintenance.

28. That Reavis does not respond to the email, but instead directly calls Miller pressuring him to take on Bremner as a client, to which Miller eventually agrees based on Reavis' reassurances that Bremner is an appropriate investor, is highly motivated and may be willing to invest more at a later date.

14.

15.29.      TThat  before investing, Bremer was given numerous opportunities to ask Miller about the function of the Aurora Hill, the volatility of the market, the trading history and the fact that neither Miller nor Argo Wealth had the ability to control the trading of the CTA's.

16.30.      That on January 16, 2019, Bremner executed documents to become a member of Aurora Hill as a limited partner.

31. That between February 2019 and March of 2019, Aurora Hill suffered losses.

32. That during Bremner's first month as a member of Aurora Hill, Aurora hlll's volume trader suffers his first month of losses.

33. That despite the fact that he was in fact a partner at the time, Miller makes the decision as the general partner of Aurora Hill not to charge the losses to Bremner as his funds had not been invested in the market yet.

34. That as it was the first month of losses, Miller deemed the loss to be a material change that needed to be disclosed to Bremner before his money was actually invested in the market.

35. Miller informs Bremner of this, however Reavis describes the decision not to charge Bremner for the losses as a "favor" to Reavis and Bremner.

17.36.    That Reavis did not disclose to Miller that he had described this action as a favor to Reavis instead of informing Bremner that it was a business decision made by Miller for the protection of the partnership.

18.37.    That during this same time frame, Bremner was given the opportunity to withdraw funds instead of having to wait the contractual 90-day redemption period.

38. That Bremner refused to do so.

39. That Aurora Hill sustains losses in Bremners first month of actual investment.

40. That Miller sent out a letter to all partners stating that while Joel 's trading resulted in the losses, he believed that Joel was also the best person to make the losses back.

41. That in the same letter Miller offered all partners, not just Bremner, the ability to redeem their shares in the partnership.

42. That Bremner refused to redeem his shares.

19.43.

20.44.    That in the summer of 2019, Aurora Hill was still taking losses.

21.45.    That despite these losses, Bremner and Reavis approached Miller seeking to be open a branch office in Illinois, with Reavis as the manager.

46. That despite protracted negotiations, which would call for Reavis to be the branch manger and Bremner would be a principal , no business plan was found to be acceptable to all parties, and the idea of the branch office was abandoned.

47. That the reason the new business venture did not go forward was Miller's decision that Five Million in investment capital would be required as a floor to begin the new venture.

48. That after negoitions broke down, unbeknownst to Miller, Reavis stopped coming in to work at Postrock.

49. That Miller made a decision as a general partner to separate Joel's trading out from the general partner trading in an effort to limit losses and begin to recoup funds using a less volatile trading strategy

22.

50. That on June 19, 2019, Bremner issued notice of redemption of his interest in Aurora Hill, but requested said interest redemption be deferred to September 1, 2019 at Bremner's request.

23.51.    That the decision of Bremner was made after Miller informs all partners that the new trading model is showing signs of success.

24.52.    That the negotiations regarding the attempts of Bremner, as  principal and Reavis, as manager, were initiated and continued after the June 2019 initial request for redemption.

25.53.    That Bremner's shares were redeemed on September 1. 2019.

26.54.      That on information and belief, based on the failure to establish a branch office and the losses of Aurora Hill, Bremner informed Reavis he was no longer willing to invest with him.

27.55.      That on information and belief, to shield himself from any claim of wrongdoing, Reavis encouraged Bremner to file an action against Miller.

28.56.      That on information and belief, Reavis assisted Bremner in drafting and filing the complaint.

29.57.      That Bremner filed the complaint against Miller, Argo Futures and Aurora Hill with the National Futures Association, (NFA) claiming lack of understanding, fraud and numerous other allegations against Miller.

58. That Reavis was named in the initial complaint as well as Postrock, Reavis 'employer.

59. That upon Bremner's filing of the NFA complaint, Miller reached out to Reavis on numerous occasions, but Reavis never responded.

30.60.      Despite his lack of communication with Miller, on information and belief Reavis was in regular communication first with Bremner, then with Bremner and his attorney.

31.61.      That on information and belief, Reavis and Bremner conspired to financially benefit from the suit against Miller.

62. That on information and belief, Bremer knew or should have known that the statements of Reavis were false.

32.63.      That Bremner claims to have drafted the complaint on his own.

33.64.      That on information and belief, the suit was in retaliation for Miller's refusal to open a branch office where Reavis was branch manager and Bremner was the principal.

34.65.      That all of the allegations in the complaint filed by Bremner were abjectly false.

~~35.~~66.     That after Miller, through his attorney made a settlement offer to Bremner, Bremner obtained counsel, Defendant Thomas F. Burke

~~36.~~67.     That through the course of discovery, documentation was provided to Bremner, through Burke, disproving any claims of churning, failure to disclose and solicitation by Miller.

~~37.~~68.     That through discovery information was provided to Bremner, through Burke, proving that the 90 day redemption period was waived, that Bremner was allowed to withdraw his funds without penalty, that Bremner affirmatively chose to participate int the fund, that Bremner contacted one of the fund CTAs directly, and that Bremner sought to enter into a second business relationship with Miller after the fund began performing poorly.

~~38.~~69.     That the conspiracy between Bremner and Reavis continued, by which Reavis sent his response to the initial NFA complaint, in which he was named, to Bremner and Burke for review, commentary and potential editing before filing.

~~39.~~70.     That after filing the Bremner / Burke approved answer, Reavis was dropped from the NFA suit as was Postrock.

~~40.~~71.     That on information and belief, it was the intention Bremner and Burke to rely upon the provably false statements of Reavis in hopes of overcoming the complete lack of factual basis for the complaint.

~~41.~~72.     That on information and belief, Burke knew or should have known that Bremner's case had no factual basis or legal foundation.

42.73.    That the filing of the suit with the NFA was in violation of the Aurora Hill partnership agreement, a fact which Reavis and Bremner and Burke knew or should have known.

43.74.    That on information and belief, Bremner persisted with the suit, filing an amendment to his original suit with the claims therein were disproven.

44.75.    That the matter was set for hearing before a three-judge panel of the NFA, who ruled in favor of Plaintiffs (Miller/Argo) on all allegations made by Bremner.

45.76.    That Bremner, Burke, Reavis attempted to use the NFA arbitration as a "lottery ticket" hoping to recover losses for funds they knew at all times were constantly in jeopardy due to the volatility of the markets.

46.77.    That as a direct and proximate cause of Bremner filing the suit, Miller was also subject to a separate NFA investigation.

47.78.    That Miller's attorney fees for the personal suit against him filed with the NFA were in excess of $40,000.00

48.79.    That not having the money to simultaneously contest the personal action and the NFA investigation, Miller agreed to surrender his license and shut down business operations at Argo Wealth Management. After 24 years in business.

49.80.    That Miller was subject to a lease at the time of all events pertinent to the actions of Bremner and Reavis.

50.81.    That due to the expense of the personal action filed by Bremner and the NFA investigation and subsequent surrender of his license, Miller had no ability to generate funds to pay the lease and was forced to default on same.

51.82.     That Miller, having no ability to generate funds, was caused to default on two separate lines of credit with a value in excess of $176,000.00.

52.83.     That but for the actions of Bremner and Reavis, Miller would still be in business today.

53.84.     That but for the need to expend $40,000.00 on his defense, Miller would have had sufficient funds to pay his lease and/or pay a substantial portion of his line of credit off.

54.85.     That the actions of Defendants were willful, wanton and malicious and were intended specifically to injure Dan Miller in his place of work and residence, the State of Ohio, and Aurora Hill Ltd and Argo Wealth Management in the place of their incorporation, the State of Ohio.

55.86.     Argo Futures, Argo Wealth, and Daniel Miller's reputations as commodity traders and managers of investment funds is critical to their occupations, livelihoods, and prospective business.

56.87.     Defendant William Reavis was at all times pertinent an individual and resident of Illinois.

57.88.     At all times pertinent, William Reavis worked as an associated person with Postrock Brokerage, LLC (hereinafter "Postrock").

58.89.     Postrock operated a division within their ranks under the name of "Argo Futures" as a DBA, with the consent of Argo Futures, for the purpose of sharing credentials in the managed futures industry.

59.90.     Postrock's personnel, including Defendant Reavis, at all times pertinent were in possession of all Aurora Hill, Ltd. documents, inclusive of its partnership agreement, subscription agreement, fund allocations, operating procedures, and fund history.

60.91.      Postrock's personnel, including Defendant Reavis, at all times pertinent had knowledge of Aurora Hill, Ltd.'s program, the commodity trading advisors (CTAs) involved, and the trading performance from all of the accounts, including an in-house account.

61.92.      Aurora Hill's funds had a net positive performance history and January of 2019 was another in a series of successful months for Aurora Hill.

62.93.      At an approximate time in early January of 2019, Defendant Reavis discussed with a client named John Bremner investment in Aurora Hill, Ltd.

63.94.      Defendant Reavis represented to John Bremner that he was with "Argo Futures" and that Dan Miller was his trusted colleague.

64.95.      Defendant Reavis recommended investment by John Bremner in Aurora Hill, Ltd.

65.96.      Postrock provided John Bremner all Aurora Hill documents.

66.97.      John Bremner was provided access to and spoke directly with one of Aurora Hill's CTAs such that he was able to assess his background and trading methodology to ensure that he was comfortable investing with the program.

67.98.      The volatility of the program was fully explained to John Bremner and known to Defendant Reavis.

68.99.      It was known to all parties, at all times, that neither Aurora Hill, Ltd., Argo Wealth, Daniel Miller, nor any other person controlled how the CTAs trade.

69.100.     On or about January 16, 2019, Defendant John Bremner entered into a subscription agreement whereby he was admitted to Aurora Hill, Ltd. as a limited partner.

70.101.     February and March of 2019 saw substantial fund losses.

71.102.     Aurora Hill, Ltd. partners, inclusive of John Bremner, were given an option to

withdraw their funds with a waiver of the ninety-day redemption period.

~~72.~~103.	William Reavis reportedly spoke to John Bremner about staying in or withdrawing his funds.

~~73.~~104.	William Reavis indicated that he regularly spoke with his client and assured Dan Miller that, while he was not happy, his client knew what he wasdoing and intended to stay in the program.

~~74.~~105.	William Reavis, who indicated that he was acting as John Bremner's agent, repeatedly and has been offered to be released from any contractualobligation to stay in the limited partnership during the luck up period.  John Bremner declined to exit the partnership.

75.106.    Defendant Reavis, purportedly speaking on behalf of his client, instructed Dan Miller that John Bremner no longer wished to speak to him or the trading principal and that all communications were to go through  Defendant Reavis.

76.107.    In the early summer of 2019, while taking losses, John Bremner and William Reavis approached Daniel Miller to establish a branch where William Reavis would be the manager.

77.108.    William Reavis had been informed that the only way for him to be compensated, other than a one-time referral fee, was to become a branch manager.

78.109.    Defendant Reavis attempted to structure a branch office of Argo Futures so that he could receive commissions off of John Bremner and his referrals. Under this arrangement, John Bremner would be a principal of the of the commodity pool operator. Detailed proposals were traded back and forth with enthusiasm between all parties.

79.110.    Defendant Reavis ultimately failed to adequately produce a businessplan that was acceptable to both Argo Futures and Postrock, so a joint decision between the two companies was made to dismiss the idea in toto.

80.111.    Defendant Reavis evidenced anger at that development by making demands and accusations. Defendant Reavis insisted that he was being treated inequitably, albeit the actual word used was profane, and wanted assurances that some amount of money that he calculated and believed was owed to him would bepaid no matter what.

Reavis left post rock, but remained registered there

81.112.    On or about June 19, 2019, John Bremner provided notice that he was redeeming his interest in Aurora Hill, Ltd., although after  being given the option to stay in the program he did then choose to stay in until September 1.

82.113.    John Bremner later informed Defendant Reavis that he would not be using his services in the future.

83.114.    In response to the potential loss of John Bremner's business, on or about August 30, 2019, Defendant Reavis published via email communication to John Bremner statements regarding Daniel Miller and Argo Futures, which were inpertinent part, as follows:

First, I'd like to say because of what transpired with Aurora Hill I have completely disassociated myself from Dan Miller and Argo Futures. Yourgut feeling of the man we have found out was unfortunately spot on. As I mentioned previously, I was led to that office via colleagues I thought were trustworthy. I feel duped and in turn I'm sure you did as well. And it's not even like I was being compensated from this investment vehicle, though I thought I would be to some regard, I never even received commissions for activity in the Aurora Hill Fund and now it may cost me a nice client. Justlast week his lack of response to a simple question regarding portfolio complexion is unprofessional to say the least.

As to your comment on my subsequent response to what transpired with Aurora Hill. I feel, I couldn't have been more aggressive in calling them out on not managing it correctly by selling us on a product that was way overly exposed to one manager. Now, this was more behind the scenes but  I spent weeks on the phone with them trying to make the situation right by you. To little to late [sic] I guess but I was able to get the fund redesignedon a fashion that I felt would do well. But at that point I was basically in damage control mode. And the reason they moved so quickly to get that done is I was using compliance terms that, I believe, scared the crap out of them. That is also why, again I believe, I was able to offer you the favorable position I was able to offer you.

84.115.    Defendant Reavis's statements that Plaintiffs Argo Futures and Daniel  Miller had committed wrongdoing with respect to management of Aurora Hill and/or violated regulatory compliance matters and/or that they acted out offear or concern with respect to Defendant Reavis's purported actions in exposing any such mismanagement or regulatory compliance issues were false.

85.116.    Defendant Reavis had no specific knowledge nor expertise with respect to the statements and claims he made to John Bremner.

86.117.    Defendant Reavis previously was informed and thereby knew that John Bremner's withdrawal of funds would collapse the Aurora Hill partnership.

87.118.    Defendant Reavis reassured Plaintiffs that that would not happen whilst, unknown to Plaintiffs, was disparaging the Plaintiffs.

88.119.    Defendant Reavis engaged in a pattern of conduct with respect to John Bremner that falsely accused Argo Futures and Dan Miller of improprieties with respect to Aurora Hill knowing or having reasonable cause to believe thatJohn Bremner would act against them under the belief that such false allegations were based on facts known to Defendant Reavis.

89.120.    Defendant Reavis knew or reasonably should have known that publishing false accusations against Argo Futures and Dan Miller would lead to such accusations being re-published, inclusive of their referral to industry regulators, financial markets, customers, and prospective customers.

90.121.    Defendant Reavis knew or reasonably should have known that making accusations against Argo Futures and Dan Miller would trigger regulatory referrals as all such complaints are thoroughly examined by regulators at substantial expense to the member firm.

91.122.    A financial services practice's reputation is one of the most importantassets a firm has and complaints against a firm remain on their permanent history indefinitely.

92.123.    Defendant Reavis acted with purpose to injure Plaintiffs and knew or reasonably should have known that his actions would harm Plaintiffs within their state of business

operations in Ohio.

93.124.    That complete diversity of citizenship exists between the parties

94.125.    That jurisdiction is proper under the Ohio Long Arm Statute and 28 USC 1332.

95.126.    That the actions undertaken by the named Defendants to harm Mr. Miller and his

companies were intentional in nature

96.127.    That Defendants knew at all times that Mr. Miller and the Argo entities were

residents of the State of Ohio and did business in same.

97.128.    That Defendants entered into negotiations with residents of the State of Ohio,

entered into business contracts with the state of Ohio, agreed to a choice of venue with

regards to those contracts located in the Northern District of Ohio, sought out business

agreements and opportunities with Mr. Miller and the Argo companies, engaged in

defamatory actions designed to injure Mr. Miller and the Argo companies, engaged in

baseless litigation against Mr. Miller and the Argo entities designed to injure them in

their state of residence and in general targeted all of their illegal actions against residents

of the State of Ohio with full knowledge and intent that the injury would occur in their

state of residence.

## COUNT ONE

## MALICIOUS PROSECUTION

98.129.    Plaintiff restates the allegations in paragraphs 1-97 as fully rewritten.

99.130.    That Bremner knew that the allegations contained in his original NFA complaint

were baseless.

100.131.    That Bremner admitted during the hearing before the NFA to never reading the

partnership agreement.

101.132.    That Burke, as Bremner's attorney had a duty to review all documents provided as part of discovery and to properly research the allegations contained in Bremner's original and amended complaint to the NFA.

102.133.    That Burke knew or should have known after the provision of discovery by Miller that the allegations of solicitation, lack of knowledge of trading practices and claims of coercion or churning made by Bremner were demonstrably false.

103.134.    That Burke knew or should have known that Bremer's failure to read the LLC document did not absolve his of the rights and responsibilities contained therein, including but not limited to knowledge of its terms.

104.135.    That Burke knew or should have know that Bremner's admitted failure to read the LLC document was fatal to Bremner's claims before the NFA.

105.136.    That upon being shown that his original allegations were not true, Bremner amended his complaint alleging new violations instead of dismissing the complaint.

106.137.    That all of the allegations in Bremner's complaint were ruled to be unfounded by the NFA.

107.138.    That Bremner, in deciding to file the suit with the NFA instead of either the Ohio Court of Common Pleas in Portage County or the Northern District of Ohio did so specifically to avoid the ability of miller to file motions for summary judgment and other dispositive pleadings.

108.139.    That there was no legal or factual foundation for Bremner's decision to ignore the venue clause in the Aurora Hill partnership agreement.

109.140.    That on information and belief, Defendant Reavis assisted in the preparation of and prosecution of the original and amended complaint.

110.141.   That this assistance included, but was not limited to providing legal advice to
Bremner, allowing Bremner and his attorney access to and approval of all pleadings and
statements made by Reavis in the NFA action, and weigh in on the issues of settlement.

111.142.   That on information and belief, Bremner did so in retaliation for Miller's refusal
to allow him to open a branch office.

112.143.   That on information and belief, Bremner did so for the purpose of avoiding legal
liability for his own improper actions.

113.144.   That on information and belief, Bremner filed the baseless suit as retaliation for
Miller's refusal to allow Bremner and Reavis to open a branch office.

114.145.   That on information and belief, Bremner's refusal to dismiss the original NFA
action, once the allegations were proven untrue was based on a personal animus against
Miller.

115.146.   That the actions of Reavis and Bremner were intentional, willful, wanton and
malicious and were based on an absolute absence of fact.

116.147.   That as a direct and proximate cause of the illegal actions of Reavis,  Bremner and
Burke, jointly and severally, Plaintiffs were damaged in an amount to be proven at trial,
said amount being in excess of $75,000.00 in actual damages and $75,000 in punitive
damages.

COUNT TWO

CIVIL CONSPIRACY

117.148.   Plaintiffs repeat the allegations contained in paragraphs 1-116 as fully rewritten.

118.149.   That Defendants Reavis and Bremner conspired to injure Plaintiffs financially
through the initiation and prosecution of a baseless NFA complaint.

119.150.   That all allegations in the complaint were disproven.

120.151.   That the NFA suit against Plaintiffs was in retaliation for Miller's refusal to allow
Reavis and Bremner to open a branch office.

121.152.   That the claims of Bremner and the actions of Reavis were wholly inconsistent
with their actions leading up to the initiation of the suit.

122.153.   That on information and belief, Reavis agreed to assist Bremner in the
prosecution of the action against Miller, knowing it was baseless.

123.154.   That on information and belief, Reavis assisted Bremner in numerous ways,
including but not limited to, assisting Bremner in drafting the complaint, encouraging
Bremner to file his complaint with the NFA in violation of the Aurora Hill partnership
agreement's venue clause, allowing Bremner and Bremner's counsel to review all
statements made by Reavis to the NFA and approve same before filing and/or testifying
and entering into an agreement with Bremner whereby he would finically benefit and/or
would not be financially held accountable for his actions as Bremner's advisor in
exchange for his support in the baseless lawsuit.

124.155.   That the actions of Reavis and Bremner were intentional, willful, wanton and
malicious and were based on an absolute absence of fact.

125.156.   That as a direct and proximate cause of the illegal actions of Reavis and Bremner,
Plaintiffs were damaged in an amount to be proven at trial, said amount being in excess
of $75,000.00 in actual damages and $75,000 in punitive damages.

COUNT THREE
Defamation Per Se

126.157.   Plaintiffs repeat the allegations contained in paragraphs 1-125 as fully rewritten.

127.158.   Defendant Reavis's statements to John Bremner about Argo Futuresand Daniel

Miller were false and defamatory.

~~128.~~159.    Defendant Reavis published the statements without privilege.

~~129.~~160.    Defendant Reavis action(s) in so publishing the statements was at a minimum negligent.

~~130.~~161.    The statements of **William Reavis** had the tendency to injure the Plaintiffs in their trade and/or occupation.

~~131.~~162.    Plaintiffs have suffered harm as a consequence of these actions of Defendant Reavis.

COUNT FOUR
Defamation Per Quod

~~132.~~163.    Plaintiffs repeat the allegations contained in paragraphs 1-131 as fully rewritten.

~~133.~~164.    The statements of Defendant Reavis had the tendency to accuse Plaintiffs of unlawful conduct, of violating duties owed to John Bremner, of self- dealing and unfair business practices, of breach of fiduciary duties, and other such interpretations of a defamatory nature.

~~134.~~165.    As a direct and proximate cause of the statements of Defendant Reavis, Plaintiffs have suffered special damages in the form of (i) adverse regulatory review and having to incur consequential, necessary expenses  in regard to same, (ii) loss of business due to damage to a 23-year reputation.

~~135.~~166.    The statements of **William Reavis** were made with anger, hatred, ill- will, vengefulness, and/or reckless disregard of the consequences or Plaintiffs' rights.

COUNT  FIVE
Tortious Interference with
Business Relations

~~136.~~167.    Plaintiffs repeat the allegations contained in paragraphs 1-135 as fully rewritten.

137.168.    The actions of Defendant Reavis were an intentional and improper

interference with the prospective contractual relations of Aurora Hill, Ltd.

138.169.    Defendant Reavis's actions resulted in economic harm to Aurora Hill,Ltd. by

inducing John Bremner not continue his contractual relations with Aurora Hill, Ltd.

COUNT SIX

BREACH OF CONTRACT BREMNER

139.170.    On or about January 16, 2019, Defendant Bremner entered into a subscription

agreement whereby he was admitted to Aurora Hill as a limited partner. A true and accurate

copy of this subscription agreement is attached hereto as Exhibit 2 and incorporated herein

by this reference as if fully rewritten [the amount of investment has been redacted from

Ex. 2].

140.171.    The Agreement, at ,r 6(a), states:

> After the Partnership begins operations, an investor will become a Limited Partner
> in the Partnership on the first day of the month following receipt by the Partnership
> of the investor's capital contribution and acceptance by the General Partner of such
> investor's executed Limited Partnership Agreement, Subscription
> Agreement/Power of Attorney, Purchaser Questionnaire and any other documents
> required by the General Partner (collectively, the 'subscription documents') no less
> than five (5) days preceding the first day of the month.

141.172.    Defendant Bremner's subscription to Aurora Hill was accepted by General Partner

Argo as of February 1, 2019.

142.173.    With his initial investment, Defendant Bremner became a twenty-three percent

(23%) owner of Aurora Hill.

143.174.    Defendant Bremner's funds were received and were to be invested as of 2/1/19.

144.175.    Defendant Bremner was issued a stock certificate with the 2/1/19 start date.

145.176.    General Partner Argo improperly delayed Defendant Bremner's admission to

Aurora Hill until March 1, 2019 ostensibly as a courtesy to Bremner because the fund had experienced significant losses in the month of February.

146.177.    Defendant Bremner was made aware by Argo in mid-February, 2019 that it delayed his admission to Aurora Hill and that it had not invested his funds as of February 1, 2019.

147.178.    Defendant Bremner did not object to Argo delaying his admission, but knew that he should have been admitted and his funds would have been invested as of February 1, 2019 but for the decision by Argo to exclude the funds in February.

148.179.    Aurora Hill experienced significant losses in the month of February 2019 which resulted in a substantial drawdown.

149.180.    Pursuant to the Agreement, at ,r 7(c), Aurora Hill's net asset value is calculated on a monthly basis, with the partners' capital accounts being adjusted accordingly such that any net loss is carried forward.

150.181.    Further, pursuant to the Agreement at ,r 7(c), any carry-forward loss must be deducted from a partner's withdrawal of capital from Aurora Hill.

151.182.    Defendant Bremner knew that but for General Partner Argo's improper decision to not invest his funds in February, he would have incurred a carry-forward loss of capital in February, 2019.

152.183.    Defendant Bremner knew that Argo's exclusion of his investment from the fund in February, 2019 was to his advantage and to the detriment of Aurora Hill and the other limited partners.

153.184.    Defendant Bremner was shown preferential treatment over other limited partners of Aurora Hill when General Partner Argo improperly delayed his admission to the fund until March, 2019, thereby saving him a carry forward loss from February, 2019.

154.185.   The National Futures Association determined this preferential treatment violated both NFA Compliance Rules and CFTC Regulation 4.7.

155.186.   Had Defendant Bremner's funds properly been invested as of February 1, 2019, the carry-forward losses of his capital would have totaled Seventy-One Thousand Two Hundred ($71,200.00) Dollars.

156.187.   Due to this improper preferential treatment, existing Aurora Hill partners absorbed all of Bremner's losses for that month.

157.188.   On or about July 8, 2019, Defendant Bremner submitted a request for redemption and subsequently received a distribution from Aurora Hill which included the $71,200.00 carry-forward loss of his capital that should have been part of the fund.

158.189.   Defendant Bremner was aware that his redemption included funds that were the result of improper preferential treatment in violation of the Agreement as well as NFA and CFTC rules and regulations.

159.190.   Defendant Bremner accordingly was improperly distributed partnership funds andhas wrongfully retained their possession.

160.191.   Aurora Hill has been consequently damaged and is entitled to the recovery of thefunds improperly distributed to and withheld by Defendant Bremner.

PRAYER FOR RELIEF

Wherefore having stated his causes of action in full, with respect to each count, Plaintiff respectfully request this Honorable Court issue an award of damages, in an amount to be proven at trial, said amount being at least $75,000.00 in actual damages and at least

$150,000.00 in actual damages, the costs of this action, including but not limited to an award of his reasonable attorney fees and any other relief that this Honorable Court shall deem to be fair and equitable.

Respectfully Submitted,

/s/ Jay F. Crook
Jay F. Crook #0078499
Jay F. Crook Attorney at Law, LLC
30601 Euclid Avenue
Wickliffe, OH 44092
PH: 440-725-6203
FAX: 440-943-3096
EMAIL: jay.crook@euclidavelaw.com

### JURY DEMAND

Now comes Plaintiff, Daniel Miller, and demands a trial by jury of the maximum number allowed by law in the above captioned matter.

Respectfully Submitted,

/s/ Jay F. Crook
Jay F. Crook #0078499